Let's proceed to the second case, the United States v. Freeman. Ms. Gambino Good morning, Judge Plum, Judge Bower, and Judge Mannion. I am here today on behalf of Rondell Freeman because at issue here is the protection of Mr. Freeman's right to due process and to a fair trial, and not only Mr. Freeman's particular rights, but the integrity of the process under which he was taken to trial. When the government knowingly uses false testimony, it is not only that false testimony that is brought into question, but the integrity of the investigation and prosecution as a whole, because a willingness to lie in court raises two obvious questions. One, what are they willing to lie about outside of court where they are not subject to challenge? And two, can you rely on the rest of their work to have integrity? So this case, let's turn to Mr. Freeman. The court erred here in refusing to vacate counts four and five, 16 through 18, and count eight. And the reason for its error was that due to its finding of prosecutorial misconduct, it dismissed the conspiracy charged in count one. Counts five and six, and 16 through 18, were all phone counts, which included in them count one as the essential first element. And count eight was the 924C count, which also included count one as its essential element. And as this court has already determined in Codefendant Wilburn's case, because of the misconduct, count four should be vacated on behalf of Mr. Wilburn. What the court did below was look at this as an inconsistent verdict case. And it's our position that that's the incorrect way to look at this. Under the inconsistent verdict law, started by Powell and Dunn, the Supreme Court said that in order to protect the jury process and the jury deliberation process from analysis and to account for the possibility of mistake, compromise, or lenity, we should not go into whether there are inconsistencies and allow such verdicts to stand. What differentiates this case, and there isn't a whole lot of case law out there. In fact, I could find nothing exactly on point, because this case has a sort of a unique set of circumstances. But if you look at this, the inconsistency here was caused by the decision of the court attempting to remedy the prosecutorial misconduct. So the same concerns of compromise, lenity, and protection of the jury deliberation process are not at issue. This case is more like what the Supreme Court and other circuits have found with regard to bench trial verdicts. They're not governed by the same rules for the reasons that I've just set out. You have one trier of fact who's making the decision, and we're not trying to protect the jury deliberation process. Similarly, this court, in looking at what happened in the Moore case, was a little bit different factual basis, where the judge had actually interrupted the jury deliberation process and took a verdict on the 924C count before the jury had come to a resolution on the predicate offense. And this court found that that was not correct, and that the case should be sent back so that the jury could first decide on the predicate, and then take it from there. In this case, we don't know what would have happened if the jury had been told that the prosecutors had put on false evidence and had bolstered that false evidence. We don't know, and if we presume that they follow their instructions, they would not have been able to convict on count one, which would have meant that they would not have been able to convict on counts 5, 6, 16 through 18, and 8 either, because all of those counts required a finding guilty on count one before they could make a finding of guilty on these counts. So for that reason, it's our position that each of these counts should also be vacated and sent back for a new trial, as the court did for Mr. Wilburn in count four. Now, the government would ask you instead to find some other conspiracy to stand in for the conspiracy on count one. And it's our position that that's an inadequate remedy for two reasons. This isn't the ordinary case where we're talking about a sufficiency of the evidence or harmless error. We know the other aspect of inconsistent verdicts is that you don't know whose ox is gored, so to speak, and the case, the government did have a right to appeal from the judge's decision on the prosecutorial misconduct, and this court sent it back. The government lost. So in effect, if you allow the counts that require the conspiracy in count one to be an essential element to stand, you're allowing the government to have an unjust windfall as a result of its own misconduct. So it's the only fair way to deal with this is to send it back for a new trial and see what happens in the lower court again. Now, the second issue raised on behalf of Mr. Freeman had to do with the court's error in failing to voir dire jurors who had been overheard discussing their opinions as to the guilt of certain defendants in the middle of the case. And this court has already dealt with that issue with respect in the context of Mr. Wilburn's brief, so I won't address that unless you have further questions. The third issue has to do with sentencing in Mr. Freeman's case. There were three problems with the sentencing in Mr. Freeman's case. The first was the drug quantity finding. The second was the reliance on Ralph LaSalle to grossly inflate the drug was the failure of the district court to allow David McClinton to testify, because David McClinton was the person that Ralph LaSalle had used or allegedly used in his testimony to deal with Mr. Freeman. And Mr. McClinton, who did not testify at trial, submitted an affidavit in which he asserted that he did not deal with Mr. Freeman on behalf of Mr. LaSalle. First of all, with respect to the drug quantity finding, the court found Mr. Freeman responsible for 90 kilos of cocaine. And this was far and above, ridiculously more than what was actually proved at trial. The evidence at trial demonstrated the actual seizures of cocaine during the course of that were two kilograms or less. And the inflation to 90 kilos depended almost entirely on the testimony of Ralph LaSalle. What was the amount the judge attributed? Excuse me? Wasn't it 18, I'm sorry, 8 kilograms? It was 8.7 kilograms of crack cocaine or 90 kilograms of powder cocaine. Which was quite a bit more than what was actually shown at trial. And the problem, the central problem, was Ralph LaSalle, because that was who she based the largest part of her drug findings on. And Mr. LaSalle testified at trial that he was introduced to Mr. Freeman by David McClinton. And at each point when he went to deliver drugs or to testify, it was David McClinton who actually did it. And it was David McClinton who used his phone to contact Mr. Freeman. Now, David McClinton was not called to testify at trial. And for that reason, and he was also not named in the indictment, there was an objection every time David McClinton was mentioned. If you go back and look at the testimony of Ralph LaSalle, Mr. Freeman's trial counsel objected to the testimony with regard to David McClinton, because he wasn't part of the charges, part of the conspiracy, and because he was not included in the Santiago profit. Now at sentencing, David McClinton was available to testify. He had submitted an affidavit for the judge's consideration, and he refuted what Ralph LaSalle had said. And the judge was not willing to hear from Mr. McClinton at the time that he was proposed. And that was a problem from the point of due process. Mr. Freeman has a right to be sentenced on reliable and accurate information, and the judge went as far as to say that she hadn't heard from Mr. McClinton, and perhaps if she had, it would have made a difference, although she didn't think so. But the point was he was there, and he was offered to testify, and she didn't want to hear from him. And this, we believe, was a violation of Mr. Freeman's due process. Would you acknowledge that Mr. McClinton, as whatever he would have said in this affidavit, and might have been expanded if he was in person, that he didn't form the basis for the bulk of the set? Because Ralph LaSalle pointed consistently at David McClinton as being the one who actually dealt with Mr. Freeman, and Mr. McClinton's testimony was no, in fact he didn't. And not only that, when Mr. LaSalle and Mr. McClinton were in prison in Wisconsin together, Mr. LaSalle had told Mr. McClinton directly that he intended to lie about Rondell Freedom in order to get his time cut, which he actually did. Mr. LaSalle, who was sentenced to 188 months and served about half of that, and the government forewent, it wasn't the prosecution, he wasn't prosecuted in Chicago, he's prosecuted in Milwaukee, but based on his cooperation, he did not have to be sentenced as a career offender. There was no 851 notice filed for him for which he was eligible, and he did half of the sentence he got. And this is after having lied to the government in the first instance. So his reliability was certainly questionable, and when you add that to Mr. McClinton's proposed testimony saying that what he had said about how their transactions with Mr. Freeman went was categorically untrue, he at the very minimum should have been heard from. And Mr. Freeman, in order to be able to present his position as to what actually happened, should have been allowed to present him. The court's unwillingness to do that was an error, and we believe that that should be remedied as well. And finally, with respect to the reliability of the evidence, it seems that the Supreme Court is clearly going in the direction of looking far more critically at relevant conduct. And when you have a case such as this one, where the proof at trial is so vastly smaller than the proof or the allegations at sentencing, and when the allegations at sentencing are brought by people of questionable credibility, then there's further reason for the court to look at it more carefully. Acknowledging, of course, that this court has said that a person can be a liar and a multi-convicted felon, and somebody can still rely on their testimony. However, there's a serious question in the case of this particular individual as to whether that should have happened in exactly the way that it did. So for all of those reasons, we would ask the court first to vacate the convictions that required count one to be an element, and secondly, to reverse sentencing. Thank you, Ms. Camino. Mr. Fullerton. Good morning. May it please the court? The district court did not abuse its discretion in ruling on the new trial motions here. As the court recognized in its prior opinion in the was to negate the effect that the false testimony had, any possible effect that the false testimony of Seneca Williams had on the verdicts, and try and identify any taint that might have affected the verdicts, and then deal with that taint. And secondly, the district court attempted to craft a remedy that would act as a, you know, I think the court said commensurate with the gravity of the misconduct, namely a sanction for the government for having introduced the false testimony and relied on it in closing argument. And the court, the district court carefully did that in its ruling on the new trial motions. It, for one thing, it granted a new trial as to all defendants on count one, the conspiracy count, and then when it came to individual counts, individual defendants such as Mr. Freeman and Mr. Wilborn, the court looked to see whether there had been a taint, it could identify any possible taint from Seneca Williams testimony on the verdict. And one way in which it did that was to say, with regard to Rondell Freeman, in count 11, the district court concluded that there was a sufficient chance that the jury relied on in understanding what had taken place in count 11, which I believe was a phone call, I'm sorry, it was a possession count, but the jury might have relied on Williams testimony in understanding the quantity involved in that possession count, that the court was unwilling to allow that verdict to stand. As to the other counts, however, and by the way, the district court did that with regard to Wilborn too, for example, on count 10, when it granted a new trial in that count as to Wilborn, the court said, well, Seneca Williams testimony was crucial to understanding what had taken place in that count, and therefore there was a possible taint, didn't let that verdict stand. But when it came to the other counts with regard to Freeman, the district court concluded that Seneca Williams testimony had not been material in any way, and no new trial was required, either to isolate and deal with the taint from the false testimony, or as a sanction for the government for its misconduct. That decision was not an abuse of discretion. A new trial was not required as a matter of law, because these counts related back to the conspiracy count, and this court made that ruling in its opinion, in the Wilborn case. So the district court was free to, had a discretion in dealing with this new There's a handful of counts at issue here. Count 4 and 5, which are both phone counts, count 8, which is the 924C count, and then count 16, 17, and 18, which are also telephone counts. Count 5, to start with, is a call between Rondell Freeman and his cousin, Robert Freeman, in which they discuss obtaining a firearm for Rondell Freeman. This call had been preceded by some discussion in person between Robert and Rondell Freeman at the Sheridan Shores condo, at which Robert Freeman advised Rondell that he knew a guy who had two firearms for sale. And in this call, Rondell Freeman gives Robert the go-ahead, like, I want some pistols, go get them. So that call can easily be understood without any reference to Seneca Williams testimony. And in fact, Seneca Williams did not testify about this call, about firearms, the firearms that Rondell Freeman had purchased on that day. In fact, Seneca Williams didn't testify about any of the phone calls that were, that are at issue on this appeal, and he also did not testify about the firearm that was the subject of count 8. So that call, count 5, is easily understood without reference to Seneca Williams, and Seneca Williams did not add anything to understanding of that call. Wilborn was not involved. Wilborn was the subject of, Wilborn's relationship with Freeman was this critical part of the false testimony of Seneca Williams, because Seneca had placed Wilborn with Freeman at a location, at a time when it was impossible for Wilborn to have been there. But as we can see with count 5 and count 8, count 16, 17, and 18, Wilborn is not involved. Wilborn's relationship with Freeman is not an issue, and Seneca Williams did not have anything to add about these counts. Count 8, as I indicated, was the 924C count, and that count is based on the videotape in which Rondell Freeman is seen handling a firearm at the Sheridan Shores condo. It was captured on a video bug that had been placed there by the agents. So the jury was not required, or Seneca Williams' testimony, his false testimony, had nothing to add. He didn't talk about that count. He didn't talk about that firearm. He wasn't there. It had nothing to do with Freeman's relationship with Wilborn, and in fact that gun that was seen on the videotape was discovered that very night at the Sheridan Shores condo when agents went into the condo late at night to maintain the bug. They thought there was a danger that the bug was going to get discovered, and so they went in to, I think, move the bug or somehow conceal it further, and when they were in the condo that night, they actually found the gun was a subject of count 8. So the district court didn't abuse its discretion in allowing that verdict to stand. Counts 16, 17, and 18 were phone calls, three calls in succession between Freeman and Sybil McClatchy, a woman who on this night was acting as a money courier for Freeman and picking up money that a man named Little E owed to Freeman, and Freeman was trying to collect the money through Sybil McClatchy, and there were two phone calls that set up the third, namely Freeman saying have you gone to, you know, Little E owes me that money, have you gone to get it from him, and then in the third phone call Sybil McClatchy reports to Freeman that the police had stopped the car in which she was riding and had taken the money from them, and in fact that night because the agents had been listening to these calls, the police had stopped that automobile and had discovered the money under the seat. Again, those calls, apparent on their face as being drug money collection calls, did not depend on Seneca Williams' testimony. Seneca Williams' testimony added nothing to the understanding of those calls, and in fact Seneca did not testify about those calls at all. So unlike what the district court did with count 11, where it granted a new trial for Freeman on a count on which Seneca Williams' testimony was important to the jury's verdict, had to do with the subject of the count, namely the quantity of drugs that were in, I believe count 11 was a, as I said, possession count on which Wilborn and Freeman were talking about the quantity that was possessed that day, and Seneca Williams interpreted the phone call and said, well that quantity was X amount of, you know, 125 grams or something like that. Now unlike count 11, where the district court granted a new trial on counts 5, 8, 16 through 18, the district court properly concluded that Seneca didn't add anything, and therefore those counts should stand. Now count 4 is admittedly more problematic because count 4, this court granted it, reversed the conviction of Brian Wilborn on count 4, sent it back for a new trial on that count. That's a call between Wilborn and Freeman, which was the subject of Seneca Williams' false testimony, that is their relationship, at least in part. But the call, I guess I have two things to say about that. One is the call is a call from Freeman to Wilborn asking where Buck is. Buck is Demarcus Williams because Freeman is trying to collect money from Buck, and Wilborn volunteers to go get him, go talk to him, get up with him, and so on. So the content of the call itself lends itself to being understood as a drug money collection call without reference to Seneca's false testimony. And the other thing I would say is because the false testimony of Seneca Williams had to do with Wilborn's relationship with the Freeman organization, there was really not an argument that Freeman was not the leader of a drug organization. The problem with the false testimony was Williams linking Wilborn to the drug organization, not the existence of the drug organization. Wilborn's defense was that he might have been a drug dealer and the Blue Devil line or the Orange Stripe line was his, but that he had a drug outlet, drug sale operation that was not part of the Freeman organization. So I think there's a distinction to be made there. I understand it's a little bit more difficult, but the district court in ruling on this motion I think did a very good job of linking it to the verdict and trying to craft a remedy that addressed the government's misconduct. So I think that those, we'd ask that the court affirm the convictions on those counts 4, 5, 8, and 16 through 18. As for sentencing, the district court did not clearly err in concluding that Freeman was responsible for more than 8.4 kilograms of crack cocaine. The district court found, as a matter of fact, again scrupulously avoiding reference to Seneca Williams and the government avoided relying on Seneca Williams as well at sentencing, but the court found without reference to Seneca Williams that the government had proved that Freeman was the leader of a drug organization that obtained, packaged, distributed, and sold crack cocaine and other drugs at Cabrini Green, that he had done so for a matter of years, that he had done so as a matter of years and it was a common course of, common scheme or plan or as part of the same course of conduct as the counts of conviction that had been allowed to stand. And in Freeman's case there was one count of conviction that is not challenged on this appeal, on which was the basis for this relevant conduct finding, that's count 3, which is a, which is an 841 count, possession with intent to distribute count. Again that count was based on the videotape from March 25th of 06, in which Freeman is seen in possession of heroin, packaging heroin, talking about distributing heroin, and so on. So the court made all of the required findings for attributing relevant conduct to Rondell Freeman. There were common victims, namely the drug addicts and people who lived at Cabrini Green. There were common actors throughout the course of this scheme or conspiracy, namely Freeman, Wilborn, Sanders, others. There was a common purpose that underlie the whole conspiracy, namely selling drugs at Cabrini Green and attempting to monopolize the sale of drugs at Cabrini Green. And that there had been a common modus operandi that underlay a significant portion of the conspiracy. That would have been, I think the one that was identified by the District Court, was the use of the Sheridan Shores condo for packaging up drugs, counting money, discussing plans, and so on. So there was a temporal continuity, there was a similarity in conduct, and there was a regularity of operation over the course of the conspiracy over a number of years, and therefore the court attributed drug quantity to Rondell Freeman for that entire period. Now when it came to the quantity finding, the court relied on the testimony of Ralph LaSalle. LaSalle had testified at trial that he was a supplier to Rondell Freeman, and he had supplied I believe some 90 kilograms as it all totaled up over the years from roughly 2000 to 2006. 90 kilograms of what? 90 kilograms of powder cocaine. He had supplied powder cocaine to the Freeman organization, your honor, and the Freeman organization, as the District Court found, primarily distributed that powder cocaine in the form of crack. It cooked the powder into crack, and the District Court found that the quantity of crack cocaine produced by what Ralph LaSalle had supplied was in excess of 8.4 kilograms of crack. The District Court was entitled to rely on Ralph LaSalle and did so. It understood that there were problems with Ralph LaSalle's testimony, and Ralph LaSalle was a cooperating defendant who had a criminal record. He was trying to get a benefit for himself by testifying but the District Court specifically found that LaSalle was credible, that the jury relied on him, and it relied on him too. It was entitled to do that, and that sort of credibility finding is not lightly overturned by this court. Certainly it can't be said to have been clearly erroneous. Now when it comes to David McClinton, first of all, after the, the District Court made its ruling on drug quantity in May of 2013, which was in the wake of the grant of a new trial, the government's appeal of that order, this court's affirmance of the order granting a new trial, and then the parties went back to the District Court. The government elected to not retry count one, but to go ahead with sentencing as to the remaining counts, and after that, then in May of 2013, the District Court wrote a very lengthy, very careful opinion about drug quantity. I think it's some, it's 57 pages long, in which the court recounted the evidence, and talked about Ralph LaSalle, and came to the conclusion that more than 8.4 kilos of crack were attributable to Rondell Freeman. It was a year and a half later, well into the sentencing process, that counsel came forward with McClinton's affidavit, which essentially, which is, first of all, it's a page and a half long. It doesn't dispute, it doesn't, McClinton does not deny that he introduced Rondell Freeman to Ralph LaSalle. He doesn't deny that he knew both Ralph LaSalle and Rondell Freeman. He, the McClinton affidavit does not deny that Freeman was a drug dealer, that LaSalle was a drug dealer. McClinton denied that he had taken part in any of LaSalle's distributions to Freeman. But I think the District Court was properly skeptical of McClinton's testimony, his affidavit, because, first of all, it had listened to Ralph LaSalle, and had seen him be cross-examined, and it evaluated all the reasons he had for being truthful, for not being truthful. And I think one critical distinction between LaSalle and McClinton was that LaSalle had a deal that required him to be truthful, required him to be fully, completely forthcoming about his own criminal activity. Otherwise, he was going to LaSalle were to be forthcoming and truthful about his criminal activity. The incentives for McClinton, on the other hand, who had not been prosecuted and who had no deal, were not to be forthcoming, were in fact to deny his own criminal involvement in any crimes. So the District Court was properly skeptical, I think, of McClinton's summary, late affidavit. And finally, the District Court did not actually refuse to hear McClinton. The District Court expressed its skepticism about what McClinton might offer on the subject of drug quantity, and counsel did not press the issue and actually obtain a refusal from the District Court to hear McClinton. But she may have been, but that's not an appealable order, her unwillingness or skepticism about what McClinton might have to offer. So for all these reasons and what's stated in our brief, we'd ask that the Court confirm the sentence of Rondell Freeman and the Court's Thank you, Your Honors. Just on that last point, my notes indicate that the District Judge said, well, the problem, speaking about the calling McClinton, well, the problem is that you are bringing in a witness who I have no basis to, I would, if I heard from him, have no basis to say he's more believable than Mr. LaSalle. Assuming that's an accurate recounting of the testimony. Mr. Fullerton makes the point that that didn't exactly bar the door. Is it your understanding that counsel didn't still demand his appearance? I mean, where are we on your understanding of whether that was pressed? Was he recluded or not? It's based on my understanding because I was there. Okay, well, that's pretty good understanding. That I had been pressing several points and the judge had said to me on a couple of different occasions that I was being too aggressive and that she understood my arguments. And in that context, it was clear to me that if I pressed again to have Mr. McClinton testify, then I was going to be crossing a line with that judge. So based on what she said in the context in which it was said, which doesn't come across on the paper, I grant you, she was not going to let him testify. Your feeling is it might have been, it was a strategic decision that to press on might impact her view of sentencing generally? Yes, that she would, she was already a little bit frustrated with me pressing issues that she felt she had already decided. And so it was basically good sense, I thought, on my part not to keep pressing her. No, I'm not questioning your judgment. I just wanted to get the settings. So that's the context. And also there are a few things that he's, he mentioned about Mr. McClinton, which he's probably not as familiar with, but Mr. McClinton did have a deal with the and he was in prison at the time of trial, which is probably why he was not called by the trial lawyer. So Mr. McClinton had no reason to make up, any more reason to make up lies, in fact, less than Mr. LaSalle, who was getting a major benefit with respect to coming into that court. But I'd like to return to the issue of Seneca Williams, because it was clear in the district court and in this court, when it dealt with the issue in the first place, that Seneca Williams testimony was not just about Freeman and Wilborn, although they were the two that were impacted the most, clearly. But his testimony, according to the district court and this court, was the glue that made the government's conspiracy case. Because he's the one that talked about codes, and he's the one that talked about how they did their practices, and he's the one that put everybody together. And as the court will recall, the other defendants that went to trial in this case defended on the grounds that they were drug dealers, but not with Mr. Freeman. That they and Mr. Freeman had social relationships, had grown up together, and worked side by side, but they weren't working for or with each other. And granted, that's a novel defense in drug dealing cases, but it made it more problematic if Seneca Williams is the glue that holds this conspiracy together, and the other defendants are defending on there not being a conspiracy, but separate buyer-seller relationships. It's not altogether clear, and it wasn't altogether clear, that there was a drug trafficking organization as such, of which Mr. Freeman was the head. So the issue is not one of sufficiency of the evidence. The issue is one of due process, because a defendant has a right to be, the government has to prove beyond a reasonable doubt, each element of a charged offense. Without the conspiracy, these other counts are missing their first and primary element. And in the context where the court has said, the verdict can stand if the predicate offense is not affirmed, those have been jury verdict cases. And this is a different context, because what is going on here is that conspiracy, which was established primarily on the basis of Seneca Williams' testimony, which was false, in a couple of different respects, is the core of the rest of the case. And the government said in its closing argument, this is the core of our case. We've already shown you that this conspiracy happened, so all of these other things follow from that. And so you cannot simply cure the taint by getting rid of the conspiracy, when the conspiracy is the critical first element of each of the subsequent counts. And we know, we've been instructed by Apprendi and Elaine, that every element of a particular charge must be proved beyond a reasonable doubt. And you can't simply say, well, this element is not valid, we're going to let the conviction stand. And especially not in a case like this, when the very reason for the dismissal of the conspiracy is prosecutorial misconduct. So I don't think it's simply enough to go through and treat this as if it was a sufficiency of the evidence problem, because it clearly is not. If the court has no more questions, we will stand on our briefs. All right. Thank you, Ms. Conveyor. Thank you, Mr. Fullerton. The case is taken under